

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*

| | | |
|---|---|---|
| *Joyce K. McDonald*<br>*Assistant United States Attorney*<br>*Joyce.McDonald@usdoj.gov* | *Suite 400*<br>*36 S. Charles Street*<br>*Baltimore, MD 21201-3119* | *DIRECT: 410-209-4899*<br>*MAIN: 410-209-4800*<br>*FAX: 410-962-3091* |

September 18, 2017

Barry Boss, Esq.
Cozen O'Connor
Suite 300, 1200 19th Street NW
Washington, DC 20036

Re:   United States v. McCormick
      Criminal No. JFM-16-149

Dear Counsel:

This letter, together with the Sealed Supplement, confirms the plea agreement which has been offered to the Defendant by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have him execute it in the spaces provided below. If this offer has not been accepted by **September 20, 2017**, it will be deemed withdrawn. The terms of the agreement are as follows:

### Offenses of Conviction

1.      The Defendant agrees to waive indictment and plead guilty to a two count Superseding Information which will charge him with two counts of wire fraud, in violation of 18 U.S.C. § 1343. The Defendant admits that he is, in fact, guilty of that offense and will so advise the Court.

### Elements of the Offenses

2.      The elements of the offenses to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:

a.      First, that there were schemes or artifices to defraud or to obtain money or property by materially false and fraudulent pretenses, representations or promises, as alleged in the Superseding Information;

1

     b.     Second, that the Defendant knowingly and willfully participated in the schemes or artifices to defraud, with knowledge of their fraudulent nature and with specific intent to defraud;

     c.     Third, that in execution of the schemes, the Defendant used or caused the use of interstate wires.

## Penalties

3.     The maximum sentence provided by statute for each count of wire fraud is as follows: twenty years of imprisonment, a term of supervised release of three years, and a fine of $250,000 or an alternative fine of twice the gross gain from the offense, pursuant to 18 U.S.C. §3571. The Court can order that the sentences on the two counts be served consecutively or concurrently. In addition, the Defendant must pay $100 as a special assessment pursuant to 18 U.S.C. § 3013, which will be due and should be paid at or before the time of sentencing. This Court may also order him to make restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664. If a fine or restitution is imposed, it shall be payable immediately, unless, pursuant to 18 U.S.C. § 3572(d), the Court orders otherwise. The Defendant understands that if he serves a term of imprisonment, is released on supervised release, and then violates the conditions of his supervised release, his supervised release could be revoked - even on the last day of the term - and the Defendant could be returned to custody to serve another period of incarceration and a new term of supervised release. The Defendant understands that the Bureau of Prisons has sole discretion in designating the institution at which the Defendant will serve any term of imprisonment imposed.

## Waiver of Rights

4.     The Defendant understands that by entering into this agreement, he surrenders certain rights as outlined below:

     a.     The Defendant has the right to have his case presented to a Grand Jury, which would decide whether there is probable cause to return an Indictment against him. By agreeing to proceed by way of Information, he is giving up that right, and he understands that the charges will be filed by the United States Attorney without the Grand Jury.

     b.     If the Defendant had pled "not guilty," he would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

     c.     If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

  d. If the Defendant went to trial, the government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in his defense, however, he would have the subpoena power of the Court to compel the witnesses to attend.

  e. The Defendant would have the right to testify in his own defense if he so chose, and he would have the right to refuse to testify. If he chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from his decision not to testify.

  f. If the Defendant were found guilty after a trial, he would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges against his. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

  g. By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that he may have to answer the Court's questions both about the rights he is giving up and about the facts of his case. Any statements the Defendant makes during such a hearing would not be admissible against him during a trial except in a criminal proceeding for perjury or false statement.

  h. If the Court accepts the Defendant's plea of guilty, there will be no further trial or proceeding of any kind, and the Court will find him guilty.

  i. By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be unable to hold a license as either a certified public accountant or an attorney.

### Advisory Sentencing Guidelines Apply

  5. The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551-3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

### Factual and Advisory Guidelines Stipulation

  6. This Office and the Defendant understand, agree and stipulate to the Statement of Facts set forth in Attachment A hereto which this Office would prove beyond a reasonable doubt and to the following applicable sentencing guidelines factors:

3

     a.     The parties agree and stipulate that the base offense level is 7, pursuant to U.S.S.G. § 2B1.1(a)(1); and

     b.     The parties agree and stipulate that 16 levels should be added, pursuant to U.S.S.G. § 2B1.1(b)(1)(J) because the foreseeable loss to investors was more than $3.5 million, but less than $9.5 million. Because the offense resulted in substantial financial hardship to one victim, the offense level is increased by two. § 2B1.1 (b)(2)(A)(iii). An additional two levels are added because a substantial part of the fraudulent scheme was committed from outside the United States. U.S.S.G. § 2B1.1(b)(10).

     c.     This Office does not oppose a two-level reduction in the Defendant's adjusted offense level, based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for his criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional one-level decrease in recognition of the Defendant's timely notification of his intention to plead guilty. This Office may oppose any adjustment for acceptance of responsibility if the Defendant (a) fails to admit each and every item in the factual stipulation; (b) denies involvement in the offense; (c) gives conflicting statements about his involvement in the offense; (d) is untruthful with the Court, this Office, or the United States Probation Office; (e) obstructs or attempts to obstruct justice prior to sentencing; (f) engages in any criminal conduct between the date of this agreement and the date of sentencing; or (g) attempts to withdraw his plea of guilty.

     7.     The Defendant understands that there is no agreement as to his criminal history or criminal history category, and that his criminal history could alter his offense level.

     8.     This Office and the Defendant agree that with respect to the calculation of the advisory guidelines range, no sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines will be raised or are in dispute.

### Rule 11 (c) (1) (C) Plea

     9.     The parties stipulate and agree pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) that a sentence of 54 months concurrent on Counts 1 and 2 in the custody of the Bureau of Prisons, together with restitution, forfeiture, and the Special Assessment of $200 are the appropriate disposition of this case. This agreement does not affect the Court's discretion to impose any lawful term of supervised release or to set any lawful conditions of probation or supervised release. In the event that the Court rejects this plea agreement, either party may elect to declare the agreement null and void. Should the Defendant so elect, he will be afforded the opportunity to withdraw his plea pursuant to the provisions of Federal Rule of Criminal Procedure 11(c)(5). The parties agree that if the Court finds that the Defendant engaged in obstructive or unlawful behavior and/or failed to acknowledge personal responsibility as set forth in Paragraph 16, neither the Court nor this Office would be bound by the specific sentencing contained in this paragraph, and the Defendant would not be able to withdraw his plea.

### Obligations of the United States Attorney's Office

10. At the time of sentencing, this Office will recommend a sentence of fifty-four months (54) months on each count in the custody of the Bureau of Prisons to be served concurrently, restitution as outlined below, no fine, and the Special Assessment of $200. The government will move to dismiss the original Indictment returned in this case and agrees to being no further charges against the Defendant based upon the conduct set forth in the Statement of Facts in Attachment A described as the "Cormier Fraud," the "Bullion Hospitality Fraud," or the "Brittingham Group Fraud." Further, this Office agrees that the United States Attorney's Office for the Western District of Arkansas has agreed not to bring charges against the defendant for the conduct set forth in the Statement of Facts of Attachment A described as the Brittingham Group Fraud with respect to victims P.D., R.T., or D.G. The defendant's guilty plea is intended to provide protection pursuant to the Double Jeopardy Clause of the U.S. Constitution from prosecution by any other U.S. Attorney or the Department of Justice in any other district for the three frauds described in the Factual Stipulation. The defendant's other criminal conduct, if any, has no protection and is not covered by this agreement.

11. The parties reserve the right to bring to the Court's attention at the time of sentencing, and the Court will be entitled to consider, all relevant information concerning the Defendant's background, character and conduct, including uncharged conduct.

### Restitution

12. The Defendant and this Office stipulate that this is a case in which a restitution order is mandatory pursuant to 18 U.S.C. 3663A(c)(1), and that the loss to the victim on Count 1 is $500,000 and the loss to the victims for Count 2 is in excess of €3 million, with joint and several liability as to Count 2.

### Forfeiture

13. The Defendant understands that the Court will, upon acceptance of his guilty plea, enter an order of forfeiture as part of his sentence, and that the order will include assets directly traceable to his offense, substitute assets and/or a money judgment equal to the value of the property subject to forfeiture, which the parties stipulate and agree is at least $500,000. Specifically, as a consequence of the Defendant's plea of guilty to Counts One and Two of the Superseding Information charging violations of 18 U.S.C. § 1343, the Court will order the forfeiture of all proceeds obtained or retained as a result of the offense pursuant to 18 U.S.C. §981(a)(1)(C); 18 U.S.C. §1956(c)(7), 28 U.S.C. § 2461(c).

14. The Defendant agrees to consent to the entry of a forfeiture money judgment and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding the forfeiture at the change-of-plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

### Assisting the Government with Regard to the Forfeiture

15. The Defendant agrees to assist fully in the forfeiture of assets. The Defendant agrees to disclose all of his assets and sources of income to the United States, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including but not limited to executing any and all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are not sold, disbursed, wasted, hidden or otherwise made unavailable for forfeiture. The Defendant also agrees to give this Office permission to request and review his federal and state income tax returns, and any credit reports maintained by any consumer credit reporting entity, until such time as the money judgment is satisfied. In this regard, the Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) as well as whatever disclosure form may be required by any credit reporting entity.

### Waiver of Further Review of Forfeiture

16. The Defendant further agrees to waive all constitutional, legal and equitable challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this plea agreement on any grounds, including that the forfeiture constitutes an excessive fine or punishment. The Defendant also agrees not to challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this agreement, and will not assist any third party with regard to such challenge or review or with regard to the filing of a petition for remission of forfeiture.

### Waiver of Appeal

17. In exchange for the concessions made by this Office and the Defendant in this plea agreement, this Office and the Defendant waive their rights to appeal as follows:

    a. The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or otherwise, to appeal his conviction;

    b. The Defendant and this Office knowingly waive all right, pursuant to 18 U.S.C. § 3742 or otherwise, to appeal whatever sentence is imposed (including the right to appeal any issues that relate to the establishment of the advisory guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and the decision whether to impose and the calculation of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release).

18. Nothing in this agreement shall be construed to prevent the Defendant or this Office from invoking the provisions of Federal Rule of Criminal Procedure 35(a), or from appealing from any decision thereunder, should a sentence be imposed that resulted from arithmetical, technical, or other clear error.

19.  The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

## Obstruction or Other Violations of Law

20.  The Defendant agrees that he will not commit any offense in violation of federal, state or local law between the date of this agreement and his sentencing in this case. In the event that the Defendant (i) engages in conduct after the date of this agreement which would justify a finding of obstruction of justice under U.S.S.G. §3C1.1, or (ii) fails to accept personal responsibility for his conduct by failing to acknowledge his guilt to the probation officer who prepares the Presentence Report, or (iii) commits any offense in violation of federal, state or local law, then this Office will be relieved of its obligations to the Defendant as reflected in this agreement. Specifically, this Office will be free to argue sentencing guidelines factors other than those stipulated in this agreement, and it will also be free to make sentencing recommendations other than those set out in this agreement. As with any alleged breach of this agreement, this Office will bear the burden of convincing the Court of the Defendant's obstructive or unlawful behavior and/or failure to acknowledge personal responsibility by a preponderance of the evidence. The Defendant acknowledges that he may not withdraw his guilty plea because this Office is relieved of its obligations under the agreement pursuant to this paragraph. The Defendant acknowledges that he may not withdraw his guilty plea—even if made pursuant to Rule 11(c)(1)(C)—if the Court finds that the defendant engaged in obstructive or unlawful behavior and/or failed to acknowledge personal responsibility. In that event, neither the Court nor the government would be bound by the specific sentence agreed and stipulated to in Paragraph 9 pursuant to Rule 11(c)(1)(C).

## Entire Agreement

21.  This letter supersedes any prior understandings, promises, or conditions between this Office and the Defendant and, together with the Sealed Supplement, constitutes the complete plea agreement in this case. The Defendant acknowledges that there are no other agreements, promises, undertakings or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement and none will be entered into unless in writing and signed by all parties.

If the Defendant fully accepts each and every term and condition of this agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Stephen M. Schenning
Acting United States Attorney

*[signature]*
Joyce K. McDonald

7

Sean R. Delaney
Assistant United States Attorneys

I have read this agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney, and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

_9/22/2017_
Date

_/s/ Mc_
Brian A. McCormick

I am Mr. McCormick's attorney. I have carefully reviewed every part of this agreement, including the Sealed Supplement, with him. He advises me that he understands and accepts its terms. To my knowledge, his decision to enter into this agreement is an informed and voluntary one.

_10/5/17_
Date

_/s/_
Barry Boss, Esq.

8

ATTACHMENT A:  Factual Stipulation

*The parties hereby stipulate and agree that had this matter gone to trial, the government would have proven the following facts through competent evidence beyond a reasonable doubt. The parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter gone to trial.*

1. Bullion Hospitality Fraud

   Bullion Hospitality and Conference Center, LLC ("Bullion Hospitality") was a Kentucky limited liability corporation, with options to purchase land near Fort Knox, Kentucky, for the purpose of building a hotel and conference center. B.B. was a principal of Bullion Hospitality. The Defendant devised a scheme and artifice to defraud S.M. of $500,000 through an advance fee scheme using Bullion Hospitality. The Defendant represented to B.B., S.M., and others that he was personally wealthy and a successful real estate developer. At that time, the Defendant had very little money and was unable to make either home mortgage or child support payments. The Defendant provided a forged Synovus Brokerage statement to B.B. showing that the Defendant's company, Triton Structure Finance Group, LLC, ("Triton") had account ***4257, with a balance on April 22, 2011, of $402,677,199.23. The Defendant further represented to S.M. that if S.M. would loan $500,000 to Bullion Hospitality by transferring the funds directly to Triton that Triton would fund the hotel/conference center project for Bullion Hospitality in exchange for 75% ownership of the project. The Defendant falsely promised that he would pay $1.5 million to S.M. or fully refund $500,000 to S.M. On May 16, 2011, the Defendant caused S.M. to wire-transfer $500,000 from his bank account in Illinois into the Triton bank account at Wachovia Bank (now Wells Fargo), which the Defendant then spent on personal and other expenses. From June 2011 through at least October 2011, the Defendant made false lulling statements to S.M. in which the Defendant

represented to S.M. that glitches in the banking system had delayed the return of his investment or that repayment was imminent. S.M. lost his entire investment of $500,000.

2.     **The Cormier Fraud**

Defendant met Joseph Cormier (hereafter Cormier) on or about July 1, 2010. Cormier was the owner of A Clear Title and Escrow Exchange (hereafter ACTEE). Thereafter, Cormier and the Defendant devised and executed an advance fee scheme which involved, among other things, Cormier invading his ACTEE escrow account and providing those funds to the Defendant. The Defendant knew that Cormier was without the authority to invade the ACTEE escrow account. The Defendant spent the advance fees he received from Cormier on his personal expenses and delivered no bank instruments, loans, or funds to any victim. In addition to this fraudulent activity, the Defendant knew that Cormier was permitting other persons to misuse ACTEE's escrow account in the same manner. From July 2010 - October 2011, investors who dealt with the Defendant sent over $2.5 million to ACTEE, and the Defendant received over $600,000 from ACTEE.

3.     **The Brittingham Group Fraud**

In summer 2015, the Defendant met over the internet The Brittingham Group ("Brittingham") through L.K., an Australian woman. Brittingham had recently been incorporated in Arkansas through its principals, B.D.B. and J.N. In telephone conversations or voice-over-internet conversations which the Defendant had with B.D.B., B.D.B. represented that Brittingham had been successfully trading medium term bank notes in Hong Kong since 2001. The Defendant never met B.D.B. in person and never communicated with him through video teleconference. However, the Defendant viewed B.D.B.'s Linkedin Profile, and the statements B.D.B. made about his background were consistent with his profile. B.D.B., J.N.,

and K.G. were the principals of Brittingham. J.N. was located in Arkansas but purportedly kept Hong Kong hours so he could conduct trades in the medium term bank notes. B.D.B. and J.N. represented that Brittingham had a number of bank guarantees (BGs) and standby letters of credit (SBLCs) totaling approximately $40 billion. B.D.B and J.N. further represented that if an investor provided €1 million to Brittingham, Brittingham would be able to pay the SWIFT fees to transfer the bank guaranty to a bank that would monetize the BG or SBLC and thereafter, provide the monetized funds to Brittingham's trade bank to be used by Brittingham to buy and sell medium term notes. The profits from the trading of the medium term notes were represented by Brittingham to be 100% of the investment thirty-six (36) times per year. Brittingham signed agreements with investors agreeing to split the profits 50-50 with the investors. The investor signed an agreement with the Defendant to splits its profits with the Defendant with 20% for the Defendant and 80% for the investor. In addition, J.N. and B.D.B. represented that the investor's €1 million would never be at risk as those funds would not be released to pay SWIFT fees until after the BG or SBLC had been monetized and funds delivered to Brittingham's trading account.

The Defendant had telephone or voice-over-internet conversations with P.D. about investing with Brittingham in late summer 2015. The Defendant held himself out as a wealthy individual, although he was not, and persuaded P.D. to invest through the Defendant's misrepresentation that he had personally invested his own funds with Brittingham. P.D. made his investment in September 2015 by wire transferring €1 million into the HSBC bank account ending in 4838 in the name of Gold Express Holdings. J.N. and B.D.B. told P.D. and the Defendant that Brittingham had bought "shelf" companies in Hong Kong and never changed the name to "Brittingham". J.N. and B.D.B. stated that K.G. was a signatory on the Gold Express

account. Despite many excuses over a long period of time, Brittingham never paid any returns to P.D.

Besides the investment to pay the SWIFT fees, J.N. and B.D.B. told the Defendant that individuals could invest with Brittingham which would in turn invest in a trade program with Westpac Bank Australia. B.D.B. told the Defendant that investor funds would be used to trigger a credit line that would be used to make the Westpac investment and that as such, investor funds would not be at risk. The Defendant falsely led victim R.T., his broker P.H., and victim D.G. to believe that the Defendant had great personal wealth and that he had personal funds invested with Brittingham. R.T. invested €1 million with Brittingham in November 2015 and wire transferred his funds to HSBC account 9838 in the name of Smart Jobs Limited. D.G. transferred €1 million of his funds to the same Smart Jobs Limited account in January 2016. Brittingham has not repaid any investor and has not paid out any profits. The Defendant participated in causing losses to these investors and P.D. of €3 million. Brittingham never paid the Defendant any funds from any source.

In addition, other potential investors were interested in whether Brittingham was paying out on its promises. The Defendant created a phony bank statement for a purported personal bank account at BB&T which reported a fictitious credit of $2,199,976 to his account from Brittingham. The Defendant used a Naples, FL, address on this account which was not his address but which was consistent with great personal wealth. The Defendant also placed on the phony bank statement transactions in the northern Virginia area. If asked, the Defendant told investors and brokers that he lived in the northern Virginia area so that no one would search for him on the Internet in Annapolis, MD, because he did not want anyone to find civil law suits,

judgments or any adverse information about him. Besides R.D., R.T. and D.G., no one else whom the Defendant attempted to recruit sent his or her funds to Brittingham.

---

I have read this agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney, and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

10/5/2017
Date

_____
Brian A. McCormick

I am Mr. McCormick's attorney. I have carefully reviewed every part of this agreement, including the Sealed Supplement with him. He advises me that he understands and accepts its terms. To my knowledge, his decision to enter into this agreement is an informed and voluntary one.

10/5/17
Date

_____
Barry Boss, Esq.

5

LEGAL\32605611\1